Mr. Kraft in this case. The court thanks you for your time and strong advocacy you've put in on behalf of Mr. Kraft. The final case for oral argument today is United States v. Huston, appeal number 23-1057. Mr. Pennington will be appearing remotely. Good afternoon, Mr. Pennington. Can you hear us okay? I can, Your Honor. My apologies. I have a little bit of a tech issue there. No, that's okay. Whenever you're ready to proceed, please go. Thank you, Your Honor. Chad Pennington on behalf of the appellant in this matter, Mr. David Huston. Mr. Huston respectfully requests that this court reverse the district court's determination that the good faith exception to the exclusionary rule applies and remand this matter for a determination of whether the warrant was supported by probable cause. Your Honor, at the outset, I would like to emphasize that this is not a case where the application of the good faith exception would further the prophylactic function of the Fourth Amendment. I think, moreover, in addition, this is not a case where the application of the good faith exception is consistent with the exclusionary rule and its primary policy justification, which is grounded in the deterrence of law enforcement investigations and deterrence specifically of Fourth Amendment violations in those law enforcement investigations. I think we can group the misrepresentations, the omissions, and the breach of department policies as regards to the Franks violation and basically just that three basic fundamental groupings. By our count, you have at least five misrepresentations or falsities, and those were material to the finding. They would be material to the finding of whether there was probable cause. The district court found up to 12 material, not material, but 12 omissions. It didn't make the finding a probable cause, but it found up to 12 omissions. There's also the breach of department policy. When you combine the three, the three of those combined, that is probative of the subjective frame of mind of the affid in this case, Officer Ross. What impact should it have that many of those omitted facts really strengthened probable cause rather than took away from it? Your Honor, I think that when we look at, we can kind of begin with the misrepresentations. When you look at, there's five misrepresentations. So are you saying we shouldn't assess the potential helpful impact of the omissions without looking at the misrepresentations first? Your Honor, I think that you would want to look at, the court would want to look at the omissions, the misrepresentations in tandem. And whether, but using the misrepresentations as a basis to say what is the effect on the probable cause finding here. And when you look at the five misrepresentations, specifically, I'll start with paragraph Q, which states that there's a person observed leaving the residence. Well, the officer on testimony indicated that that just wasn't observed. So when you look at that particular information submitted in the affidavit, it has a material effect on the subsequent portions of the warrant. Paragraphs R, S, and T, they're all built on, they're all premised on someone being seen coming from that residence, being viewed. And it gives the impression that the person was seen being viewed from that specific residence. And then having subsequently been pulled over and having narcotics found in the car. But there's no, that wasn't true. Nobody was seen coming from the actual residence. So it gives a false impression. I think when you look at the misrepresentations and the omissions, Your Honor, I don't think you exclude omissions that potentially would be helpful to the government's case here. But when you look at the effect of the misrepresentations, first and foremost, it has a material bearing on the finding of probable cause in a way that the omissions just don't equal. I mean, paragraphs Q through T are predicated entirely on a person being observed exiting that particular residence, being followed, committing a traffic violation. How material is that, though, given that there were only two entrances to the facility, and they know he didn't go in one. They know he went in the building, and the only location the other entry led to was to the defendant's apartment. Your Honor, I think it is very material. And the reason it's very material is because we don't, if you don't know which particular residence he entered, well, then you really can't make an inference as to whether the narcotics could have been found in Mr. Houston's apartment. It can't be inferred that he entered Mr. Houston's apartment because he wasn't observed going in the other door, which led elsewhere. There was only one other way for him to get in. Your Honor, I think that the inference could be made, sure, but I think that when we look at whether there's probable cause and whether there's a fair probability that the narcotics were found in Mr. Houston's residence, that didn't happen. So that undercuts the finding of whether those drugs, there's a fair probability that they're animating for Mr. Houston's residence. That just simply didn't happen. We didn't see the person exit from there. So I want to go back to the tipster, though, because, you know, you made some point about, you know, what, you know, in the affidavit, it gives the impression that he's anonymous. He isn't. As it turns out, you know, they sat around with him for 15 minutes and he takes them and he shows them the place and they eventually decide to pay him. But that struck me as one of those facts that it wouldn't, it would only have helped the affidavit to have said this was actually a person known to us and, you know, there's plenty of law that says that. So I'm having trouble seeing the materiality. And once you get all that information from the tipster about how much drugs he was able to buy and what was in the apartment, a lot of the rest of this is cumulative. And the district court makes the factual finding that maybe, maybe there's exaggeration or maybe there's, you know, there are slight misstatements, but that this was not done in a way that was designed to, you know, bolster probable cause where it wasn't there. Your Honor, I would say that with respect to what was omitted as to the tipster, it does read as if it's an anonymous tipster, but it's not. But there's also the omissions that go to this particular informant's credibility. It's not just that he's anonymous or not anonymous. It's the information that is omitted goes directly to the information and whether it's a credible source or not. He's got a bigger criminal record than people thought, but they thought there was something. And the state judge takes that much into account when he issues the warrant. I just don't see why it makes the affidavit that much worse off by failing to say that we actually know who this tipster is. An anonymous source could be anything. Your Honor, I think it would also be the type of criminal history. It's not just the omission of the criminal history, the abstract. It's the kind of criminal history. There's criminal history that relates to domestic battery. There's criminal history that relates to a crime of moral turpitude, theft. But he didn't know that before he submitted the affidavit, did he? The detective, I think the district court made the determination that the detective did not know the extent of his criminal history when he completed the affidavit. Now, maybe we could certainly talk about whether or not he should have done it beforehand. But for a Frank's violation, that's an intentional or reckless disregard. And if he didn't know the information, how do you make that finding? Your Honor, I think the testimony established that he had the capacity to find out had he just did a basic search. It's telling that they know. But he didn't know. I think the judge made the specific finding. He did not know here. That is correct, Your Honor. I think what it goes to, again, is the subjective state of mind of the affiant here and the circumstantial evidence that he's acting recklessly. And he's not comporting with departmental rules in seeking the effort in the affidavit. And I would judge the one point regarding a question posed earlier is I don't think the district court comes out and makes a finding as to the implication of all the omissions. It says that many of the omissions can be explained away, but not all of them. And I think that's important here on whether the district court views its discretion because it's really not working through all of the omissions and their implication on the finding of whether it was a Frank's violation. If I may, Your Honor, may I reserve the remainder of my time? Yes, of course. Mr. Whalen? May it please the Court. Good afternoon, Your Honors. Nathaniel Whalen here on behalf of the United States. I want to pick up on what the defendant just said. This isn't a case about abusive discretion. This is a clear error standard of review. And those words weren't uttered at any point during the argument. They're barely touched upon upon the brief. And this is a different procedural posture than the Frank's hearings usually come up to this court. Usually it's a question of whether there should be a hearing or not. Excuse me, Your Honors. Do you want some water? I think I'm okay. I'll push through it. This is a case where Judge Brady sat and she had a hearing. She observed the testimony of Officer Smith. She observed the testimony of Officer Ross. She heard the arguments that are reiterated again on appeal. And she made a credibility determination that they were not acting recklessly or with intentional disregard for, you know, they weren't trying to pull the rug out from under the issuing magistrate's eyes. Judge Williams, this court's case in Williams goes directly to your Honor's question about how much weight we give the omitted information that would have supported probable cause. And that's what Judge Brady found. She found that there were a lot of things that were omitted that would have supported probable cause. And, Your Honors, it hit upon them. That doesn't bolster the probable cause analysis because we're confined to the four corners of the affidavit. What it does show, though, it supports the inference that these officers weren't tunnel visioned and they weren't going for probable cause at all costs. They weren't trying to commit a ploy upon the issuing magistrate. They weren't just leaving the bad stuff out. Correct, Your Honors. They were leaving a lot of stuff out. And, you know, that's frustrating as we sit here today that it wasn't included in the affidavit for sure. But it does go to support Judge Brady's credibility determination that they weren't acting with reckless disregard or intentional misconduct. But there are inconsistencies that the judge kind of doesn't really quite address, right? And what I'm referring to is this whole thing about the green Mini Cooper, right? And the fact that the tipster tells Detective Ross that the Mini Cooper is one of the cars that Mr. Houston owns, doesn't say anything about driving it. They never see Mr. Houston in the car, driving the car. And yet in the affidavit, Officer Ross says, Detectives were told that Houston has multiple vehicles but that he drives a green Mini Cooper. That was never stated. That does not appear in the transcript. And then in P, they said, We then returned to the area and while conducting surveillance observed the green Mini Cooper that Houston is believed to be driving arrive. To me, that wording is like almost too clever by half, right? It's like we can't say he drove it because we didn't see him drive it, right? But we can say that it's a car we think he drives and it arrives, so therefore he must be there. That in conjunction with the allegations regarding Mr. Gregory coming in and out and the admission that Mr. Gregory is a known drug dealer himself. And so it's not surprising they find drugs in his truck. What troubles me about the affidavit is that it really looks like it's quite slanted in trying to give, trying to convey the impression that we know that Mr. Houston is there because we see the green Mini Cooper, which he's believed to be driving, even though no one told us that. And then we have Mr. Gregory, which, who, by the way, is a known drug dealer, but we don't tell you that. And he has drugs after he visited there. That, at least to me, raises some yellow, if not red flags. And maybe drugs before he visited there. We have no idea what was in the car, what was in the truck beforehand. And yet the district judge, with regard to the Mini Cooper at least, doesn't even talk about that, right? He just says, although the tipster was incorrect about the owner or even the driver of the Mini Cooper, it matters little. In fact, it wasn't the tipster that was incorrect. It was the affidavit that was incorrect about what the tipster informed Detective Ross and kind of, again, kind of played some word games about whether or not Mr. Houston was actually driving the Mini Cooper that night. And let me just lay one more thing on there. That, the Mini Cooper information is really the only information in here that is really attempting to corroborate what was told by the tipster. Because this is represented as the tipster said that. And, yes, we saw the Mini Cooper kind of suggesting Houston was driving it. So there you go, Mr. Allen. In five minutes. Your Honors, I'm happy to address all those points to the extent I can. And to the extent I miss any, please let me know. Judge Lee. All right. Let's talk a little bit about paragraph P. To the extent that it was suggested that it was written to be a little too cute at half, Detective Ross was asked about this. He was asked about this during the hearing on page 128. And did you intend to mislead the magistrate judge or the issuing judge when you said this? He says no. He says I didn't mean to imply that Mr. Houston is the one who's driving this car. I didn't mean to imply that he was the one that we saw get out of the car. He says I should have written it differently. He acknowledges he should have written it differently. And admittedly, the district court doesn't go through each one of the alleged omissions and says here's why I believe this particular explanation. Here's why I believe this particular explanation. I think the court talks about it more in kind of a global summary, saying that I believe, and this is page 6 of the court's order, the court finds no evidence that these omissions were made recklessly or intentionally. And the court says that the court finds Sergeant Ross's testimony credible. By finding that Sergeant Ross's testimony was credible, the court, I believe, is sending a signal to at least this court that it's finding his explanation that he just wrote it poorly. Paragraph P. And he acknowledges much. And it's possible that a different district court judge might have reached a different conclusion. It's possible that I read the record a little bit differently and that your honors might read the record a little bit differently, but we aren't the ones sitting observing Sergeant Ross testify. Sergeant Ross, you know, there's one thing to say, yeah, I wrote it badly. There's another thing to show genuine remorse. And that's why the clear error standard of review matters in this case because the district court's the one who's sitting there observing Sergeant Ross. To the extent that there's questions about corroborating and what else they corroborated of the tipster's allegations, they sat there for five hours, six hours observing. They saw 30 people come and go on a cold, snowy February day. They believed that they corroborated the tipster's information. But some of those people coming and going were very legitimate. That is certainly the argument. There are some people. There's a person in the back you can see on the pole camera who's fixing a car. There are his roommates. I think they're identified later on. The tipster also tells the police officers that Mr. Houston delivers. So while roommate might be an innocuous explanation as to why they're there, the fact that the minicoup that is affiliated with this address is coming and going multiple times throughout this particular observation period and that the roommates might have been there, I mean, there are innocuous explanations. I don't think those have to be inferred per se on this record. I think hopefully I got through Your Honor's questions on those issues. To the extent that I didn't, I'm certainly happy to address them. You know, the fact is the district court lists a bunch of bullet points on page 4 and 5 of its opinion that it believes are omissions and the singular misstatement. The courts recognized them. The court, Mr. Ross, Officer Ross, Officer Smith were both asked about them. Officer Smith says that I could see the entranceway to the apartment, but I couldn't see the right door. It's technically wrong that someone saw Gregory go into the left door. It's certainly a reasonable inference that he did. The court was able to observe their testimony, observe their explanations, and it did find that there were omissions. I mean, we can't fight that fact as we sit here on appeal. But the arguments that are being raised again, to the extent that they were raised to the district court, are the ones the district court considered. And it heard Sergeant Ross, it heard Officer Smith testify. It made a credibility determination, and that was not clearly erroneous on this record. I'm aware of a single case where this court has held reverse to district court's credibility determination after a Franks hearing, and that's the Whitley case that we cite in our brief. That's a case where the district court judge finds the officer lied in one case and then turns to the co-defendant's case and says, I didn't think he lied on this case because there was corroborative evidence. And this court looked and looked through the record, and there was no corroborative evidence. So you rightly reach the conclusion, well, if you lied in this case, you lied in this case, but you believe the corroborative evidence supports it, but there's no corroborative evidence, that's clear error. That is not this case in front of this court. To the extent the court has any further questions, you know, there was a lot of discussion on good faith, but we'll rest our briefs on that unless the court has any questions. Thank you, Your Honors. Mr. Pennington. Thank you, Your Honor. I would say that with respect to the misrepresentations, I would disagree that there was 30 people coming and going. During the relevant time, it was far less. The video footage certainly does not corroborate that testimony in any way. And it's not a four and a half, five hour period of surveillance. It's a roughly hour, hour and a half period of surveillance. There's a protracted break. There's about another hour, hour and a half period there as well. So it's a very minimal amount of preliminary investigation here. And it doesn't support what's in the affidavit. There's not constant foot traffic coming and going. There's not cars coming and going. And with regards to the abuse of discretion, the district court doesn't grapple with the green Minnie Cooper that Judge Lee alluded to. It doesn't grapple with the blue Hyundai that's simply not in the, it's in the affidavit, but it is not observable in the video footage. That's the basis of the abuse of discretion here. The district court certainly heard testimony, but the abuse of discretion standard turns on whether there's a firm conviction of whether a mistake has been made. And this is exactly that case. We understand that the court's precedent here certainly favors not applying the suppression remedy when a warrant is sought. I certainly understand that. And if there's a case where remedy should be suppression here, this is it. This is exactly what the good faith exception was not designed to do. We specifically have here a violation. And what we have here is a case where you have suppression being the appropriate remedy. It's exactly what it's designed to do. And that's to deter police. I would say the very least reckless conduct here. It's a sloppy warrant. It's put together in a way that it does not correlate at all with what was observed on the scene. This is not a case where the remedy should not be the exclusionary rule. So for those reasons, Your Honor, we would ask that the district court reverse here and remand. Mr. Pennington, what is your response to the point the government makes that here Detective Ross spoke to a deputy prosecutor? That he consulted with a deputy prosecutor, showed the deputy prosecutor the affidavit. And so it's not him just acting rogue on its own. He actually consulted with someone outside the department before submitting the affidavit and the application. Your Honor, I would say that that information can be prima facie evidence of a lack of bad faith or good faith. But the information that's shared and that's reviewed is only as good as the source of information. The district court placed dispositive weight on the conference, but the conference is only as good as the information that's shared. If we have up to five misrepresentations and those misrepresentations are not conveyed to the prosecutor, such as a green card not actually arriving, a blue card not being present, someone not exiting the door as stated, that the person who's actually being pulled over is Gregory Randall, a known drug dealer in and of himself. If that information is not communicated, then the conference with the prosecutor serves no utility. It doesn't help the showing of good or bad faith because the information proffered to the prosecutor is not accurate. So I don't think the court can rest here just solely on the act of communicating or conferring with the prosecutor. The information conveyed there needed to be accurate too. And if the court has anything further, we will rest. Thank you, Mr. Pennington. The court will take the case under advisement and that concludes oral arguments for today. Thank you.